COMMONWEALTH of Pennsylvania,
Appellee

v.

Vincent Andrew CASCARDO,
Appellant.

Superior Court of Pennsylvania.

Argued April 29, 2009.

Filed Sept. 2, 2009.

Vincent J. Quinn, Lancaster, for appellant.

David J. Arnold, Assistant District Attorney, Lebanon, for Commonwealth, appellee.

BEFORE: ORIE MELVIN, GANTMAN and CLELAND, JJ.

OPINION BY CLELAND, J.:

¶ 1 Appellant, Vincent Andrew Cascardo (Cascardo), appeals the judgment of sentence entered on January 23, 2008 by the Court of Common Pleas of Lebanon County following his conviction for first-degree murder, criminal conspiracy to commit first-degree murder and other related offenses. Cascardo challenges several of the trial court's evidentiary rulings and alleges a *Brady*[1] violation. Because we conclude the claims are without merit, we affirm.

¶ 2 At trial the Commonwealth argued Cascardo and Rodney Gerber (Gerber) conspired and murdered Daniel Hoffner (Hoffner). According to the Commonwealth, Cascardo was involved in loan sharking activities. Gerber and Hoffner were involved with Cascardo in these activities, although they played different roles. Hoffner "invested" approximately $50,000.00 with Cascardo, who in turn loaned this money to other people at usurious interest rates. Among others, Cascardo loaned money to Gerber. When Hoffner asked Cascardo to return his money, Cascardo conspired with Gerber to kill Hoffner. *See* Trial Court Opinion, 9/14/07, at 1–2, 10.

¶ 3 On September 25, 2007, after a six-day trial, a jury found Cascardo guilty of first-degree murder, criminal conspiracy to commit first-degree murder, third-degree murder, criminal conspiracy to commit third-degree murder, two counts of aggravated assault, and two counts of criminal conspiracy to commit aggravated assault in connection with the killing of Hoffner.[2] On January 23, 2008, the trial court imposed concurrent sentences of life imprisonment for first-degree murder and conspiracy to commit first-degree murder. All other convictions merged for sentencing purposes.

¶ 4 Cascardo filed a post-sentence motion for a new trial claiming the Commonwealth failed to disclose exculpatory grand

---

**1.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**2.** 18 Pa.C.S.A. §§ 2502(a), 903/2502(a), 2502(c), 903/2502(c), 2702(a)(1), 2702(a)(4), 903/2702(a)(1), and 903/2702(a)(4), respectively.

jury evidence. The trial court set a hearing on the motion and granted Cascardo's request for leave to file supplemental post-sentence motions. After a hearing, the trial court granted another defense request for leave to file additional supplemental post-sentence motions. After reviewing all Cascardo's post-sentence motions, the trial court denied them all on May 9, 2008.

¶ 5 This appeal followed. Both the trial court and Cascardo complied with Pa. R.A.P.1925.

¶ 6 On appeal, Cascardo raises the following issues for our review:

A. Whether the lower court erred when it overruled [Cascardo]'s motion *in limine*, sustained the Commonwealth's motion *in limine* and allowed the Commonwealth to introduce evidence from David Nicodem, Lance Kase, Sandra Latcheram, Rodney Gerber, Ronald Light and Douglas Emswiler, Sr. to the effect that [Cascardo] had engaged in loan-sharking when said evidence of prior bad acts was irrelevant and highly prejudicial to the charges pending against [Cascardo]?

B. Whether the lower court erred when it ruled that if [Cascardo] testified at trial the Commonwealth could impeach his credibility with his stale federal convictions for collection of extensions of credit by extortionate means in violation of 18 U.S.C. [§ 894] and tampering with a witness in violation of 18 U.S.C. [§ 1512]?

C. Whether the lower court erred in overruling [Cascardo]'s motion *in limine* and permitting the Commonwealth to introduce hearsay statements by David Hoffner to the effect that he removed unreported income from the family business without disclosing it in bankruptcy court, placed it with a "guy" knowing that his actions were unlawful and

planned to confront the "guy" in order to obtain the return of the money that he had given to him plus high interest?

D. Whether the lower court erred in denying [Cascardo]'s motion for a new trial when the district attorney failed to provide defense counsel with transcripts of the grand jury testimony of the police prosecutor when the transcripts contained exculpatory evidence which was favorable to [Cascardo] on the issue of guilt?

Appellant's Brief at 4.

¶ 7 In addressing Cascardo's claims relating to the alleged evidentiary ruling errors, we are guided by the following principles:

When reviewing questions regarding the admissibility of evidence, our standard of review maintains the "admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion." *Commonwealth v. Cunningham*, 805 A.2d 566, 572 (Pa.Super.2002), *appeal denied*, 573 Pa. 663, 820 A.2d 703 (2003). "[A]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record." *Commonwealth v. Cameron*, 780 A.2d 688, 692 (Pa.Super.2001).

*Commonwealth v. Seilhamer*, 862 A.2d 1263, 1270 (Pa.Super.2004).

*A. Prior bad acts*

■ ¶ 8 Cascardo argues the trial court erred in permitting the Commonwealth to introduce evidence Cascardo had engaged in loan-sharking activities because the evidence (i) was irrelevant and (ii) even if tangentially relevant, its relevance was

outweighed by the unfair prejudice. Appellant's Brief at 18–22.

¶ 9 In *Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491 (1988), our Supreme Court summarized the law regarding the admission of prior bad acts as follows:

> Evidence of distinct crimes [is] not admissible against a defendant being prosecuted for another crime *solely* to show his bad character and his propensity for committing criminal acts. *Commonwealth v. Banks,* 513 Pa. 318, 349, 521 A.2d 1 (1987); *Commonwealth v. Morris,* [493 Pa. 164, 174, 425 A.2d, 715, 720 (1981)]. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character. *Commonwealth v. Claypool,* 508 Pa. 198, 495 A.2d 176 (1985). As we recently stated in *Banks:*
>
>> [T]he general rule prohibiting the admission of evidence of prior crimes nevertheless
>>
>> allows evidence of other crimes to be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.
>>
>> [*Morris,* 493 Pa. at 175, 425 A.2d at 715]. This list of "special circumstances" is not exclusive, and this Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury. [*Claypool,*] *supra* (evidence of defendant's prior criminal activity is admissible where defendant makes statement about such activity in order to threaten and intimidate victim and where force or threat of force is element of crime for which defendant is being prosecuted).
>
> [*Banks,*] 513 Pa. at 350, 521 A.2d at 17. Another "special circumstance" where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. *Commonwealth v. Murphy,* [346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985)], quoting *Commonwealth v. Williams,* 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the "res gestae" exception to the general proscription against evidence of other crimes, is also known as the "complete story" rationale, *i.e.,* evidence of other criminal acts is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." McCormick, *Evidence,* § 190 (1972 2d ed.); *Carter v. United States,* 549 F.2d 77 (8th Cir.1977); *United States v. Weeks,* 716 F.2d 830 (11th Cir.1983); *see also Commonwealth v. Coyle,* 415 Pa. 379, 389–91, 203 A.2d 782, 787 (1964) (evidence of other crimes admissible as these crimes were interwoven with crimes for which defendant was being prosecuted).

*Lark,* 518 Pa. at 302–04, 543 A.2d at 497.

¶ 10 The trial court found the testimony relating to prior bad acts was admissible

under the history of the case exception. Specifically, the trial court, in admitting the testimony, reasoned:

> In this case, the Commonwealth's theory is that [Cascardo] earned a living through "loan-sharking" in which threats and intimidation were tools of his trade. The Commonwealth will connect both [Hoffner] and [Gerber] to [Cascardo]'s business. Although Gerber was a debtor of [Cascardo] and Hoffner was a creditor, both were essential to [Cascardo]'s loan-sharking business, albeit in different ways. Without the money invested by people like Hoffner, [Cascardo] would not have the funds needed to loan money to others at usurious rates of interest. Without [debtors] like Gerber, [Cascardo] would not earn a profit based upon his excessive interest. As we see it, [Cascardo]'s loan-sharking activities are an integral part of this fact pattern and represent the only way that the Commonwealth can fully explain the connection between Hoffner, Gerber and [Cascardo]. As such, evidence of loan-sharking by [Cascardo] constitutes "the chain or sequence of events which forms the history of the case and [was] part of its natural development."

Trial Court Opinion, 9/14/07, at 13.

¶ 11 The trial court also found these facts could show Cascardo's (and Gerber's) motive to kill Hoffner. "To be admissible to show motive, the evidence must provide a sufficient ground to believe that the crime currently being considered grew out of, or was in some way caused by, the prior set of facts and circumstances." *Commonwealth v. Spotz*, 562 Pa. 498, 524, 756 A.2d 1139, 1153 (2000).

¶ 12 Regarding the motive exception, the trial court noted:

> As we understand it, [Gerber] will testify that he killed Hoffner because he owed money to [Cascardo] and feared

what [Cascardo] might do in order to collect that money. Given this testimony, the reasonableness of Gerber's fear of [Cascardo] is certainly an issue. If we were to hide from the jury [Cascardo]'s loan-sharking methods of operation, there would be nothing to corroborate Gerber's bald assertion of fear . . . .

> [Evidence of Cascardo's loan-sharking activities] is also critical to explain why Hoffner would give money to [Cascardo] and why [Cascardo] would have a motive to avoid repaying that money. Evidence of [Cascardo]'s loan-sharking presents the only plausible explanation for the link between Hoffner, Gerber and [Cascardo]. As such, it constitutes an integral part of the sequence of events that form the history of this case.

Trial Court Opinion, 9/14/07, at 14.

¶ 13 The trial court also considered the potential for prejudice to Cascardo. "The particular prejudice that Rule 404(b)(3) seeks to prevent is the misuse of the other-offense evidence-specifically, that jurors might convict a defendant because they perceive the defendant has a bad character or propensity to commit crimes." *Commonwealth v. Hacker*, 959 A.2d 380, 392 (Pa.Super.2008) (citation omitted).

¶ 14 The trial court balanced the Commonwealth's need for the evidence against its potential for prejudice. The trial court wrote "we view evidence of [Cascardo]'s loan-sharking activities as vital to the Commonwealth's case. Such activities provide the only conceivably viable explanation for the Commonwealth's theory of what occurred." Trial Court Opinion, 9/14/07, at 15.

¶ 15 Finally, to address the potential prejudice, the trial court gave cautionary and limiting instructions relating to the prior bad act evidence. *See, e.g., Commonwealth v. Williams*, 586 Pa. 553, 581,

896 A.2d 523, 540 (2006). The trial court properly instructed jurors how they were to consider the prior bad act evidence. Specifically, the trial court cautioned the jury as follows: (i) Cascardo could not be convicted of murder only because he was allegedly involved in loan-sharking activities, and (ii) the evidence of loan sharking could not be used to establish Cascardo was a person of bad character or had criminal tendencies from which guilt could be inferred. *See* N.T. Trial, 9/18–9/25/07, at 1238–40.

¶ 16 Additionally, the trial court instructed the jury to use the evidence only for two purposes. First, "the evidence provided background information that the Commonwealth asserts can be used to explain why [Cascardo] came into contact with [Gerber] and [Hoffner]." *Id.* at 1239. Second, "I permitted the Commonwealth to tell you about [Cascardo]'s loan sharking activities . . . because it has relevance to [Cascardo]'s motive." *Id.*

¶ 17 Upon review, we conclude the trial court did not abuse its discretion in admitting evidence of Cascardo's prior bad acts.

### B. *Impeachment evidence*

■ ¶ 18 Cascardo argues the trial court erred in ruling the Commonwealth was permitted to impeach him with his federal convictions for collection of extensions of credit by extortionate means (18 U.S.C. § 894) and tampering with a witness (18 U.S.C. § 1512).[3] Cascardo argues the federal convictions do not involve crimes of dishonesty or false statement and, in any event, said convictions are stale. Appellant's Brief at 16.

¶ 19 The relevant rule of evidence provides as follows:

---

**3.** Because the trial court decided it would have allowed the Commonwealth to impeach Cascardo with the two federal convictions,

### Rule 609. Impeachment by evidence of conviction of crime

**(a) General rule.** For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or nolo contendere, shall be admitted if it involved dishonesty or false statement.

**(b) Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Pa.R.E. 609(a), (b).

¶ 20 Regarding Cascardo's conviction for collection of extensions of credit by extortionate means, the trial court found the offense similar to theft by extortion, 18 Pa.C.S.A. § 3923, which is "clearly a *crimen falsi.*" Trial Court Opinion, 7/8/08, at 18 (quoting *Commonwealth v. Henson*, 269 Pa.Super. 314, 409 A.2d 906, 907 (1979)).

¶ 21 Cascardo does not argue theft by extortion is not a *crimen falsi.* Appellant's Brief at 24. Cascardo argues, in a theft by extortion situation, a defendant, "by his action, coerces another person to give him money or other property." *Id.*

---

Cascardo elected not to testify at trial. Appellant's Brief at 23.

Cascardo, however, maintains collection of extensions of credit by extortionate means is not a *crimen falsi* because there is no element of dishonesty or theft. *Id.* Cascardo concludes "[s]ince the offense of collection of extensions of credit by extortionate means is not *crimen falsi* in nature, it is not admissible to impeach under Pa.R.E. 609." *Id.*

¶ 22 As our Supreme Court has explained, the term *crimen falsi* "involves the element of falsehood, and includes everything which has a tendency to injuriously affect the administration of justice by the introduction of falsehood and fraud." *Commonwealth v. Jones*, 334 Pa. 321, 323, 5 A.2d 804, 805 (1939) (citation omitted).

¶ 23 As Justice Saylor noted in *Commonwealth ex rel. Baldwin v. Fisher*, 570 Pa. 416, 809 A.2d 348 (2002) (Saylor, J., dissenting),

[I]n recent years, there has been a tendency to view the dishonest intent inherent in theft generally as implicating this modern *crimen falsi* classification, *see, e.g., Commonwealth v. Paddy*, 569 Pa. 47, 80, 800 A.2d 294, 314 (2002), with the result that theft by unlawful taking is now an appropriate basis for impeachment of a witness, *see Commonwealth v. Baxter*, 537 Pa. 41, 46, 640 A.2d 1271, 1273 (1994), although it does not necessarily involve any deception.

*Id.* at 412, 809 A.2d at 351.

¶ 24 Here, the relevant federal statute provides as follows:

### § 894. Collection of extensions of credit by extortionate means

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 894(a).

¶ 25 For purposes of collection of extensions of credit by extortionate means, the relevant statute defines, among others, the following terms:

### § 891. Definitions and rules of construction

(1) To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

* * *

(4) The repayment of any extension of credit includes the repayment, satisfaction, or discharge in whole or in part of any debt or claim, acknowledged or disputed, valid or invalid, resulting from or in connection with that extension of credit.

To collect an extension of credit means to induce in any way any person to make repayment thereof.

* * *

(7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

18 U.S.C. § 891.

¶ 26 Therefore, under section 894, a person is guilty of collection of extensions of credit by extortionate means if he knowingly induces another person to make repayment of an extension of credit through extortionate means.

¶ 27 The Crimes Code defines theft by extortion as follows:

(a) Offense Defined.—A person is guilty of theft if he intentionally obtains or withholds property of another by threatening to:

(1) commit another criminal offense;

* * *

(7) inflict any other harm which would not benefit the actor.

18 Pa.C.S.A. § 3923.

¶ 28 Additionally, the Crimes Code defines the words "Obtain," "Property" and "Property of another" as follows:

"Obtain."

(1) To bring about a transfer or purported transfer of legal interest in property, whether to the obtainer or another; or in relation to labor or service, to secure performance thereof.

"Property." Anything of value, including real estate, tangible and intangible personal property, contract rights, choses-in-action and other interests in or claims to wealth, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power.

"Property of another." Includes property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property and regardless of the fact that the other person might be precluded from civil recovery because the property was used in an unlawful transaction or was subject to forfeiture as contraband. Property in possession of the actor shall not be deemed property of another who has only a security interest therein, even if legal title is in the creditor pursuant to a conditional sales contract or other security agreement. 18 Pa.C.S.A. § 3901.

¶ 29 Theft by extortion essentially requires an actor who intentionally induces another through threats to transfer property to the actor or a third party. Section 3923 provides a list of threats relevant for purposes of the offense. An actor is criminally liable for theft by extortion "regardless of the fact that the actor also has an interest in the property." 18 Pa.C.S.A. § 3901. Both offenses, therefore, essentially involve the intentional conduct of an actor to induce another person to relinquish property through coercion and threats.

¶ 30 As the trial court noted (quoting *Commonwealth v. Neubauer*, 142 Pa.Super. 528, 16 A.2d 450, 452 (1940)), this Court stated, "To extort is to wrest from, to exact, to take under a claim of protection, or the exercise of influence contrary to good morals and common honesty." Trial Court Opinion, 7/8/08, at 18.

¶ 31 Given that theft by unlawful taking (*Commonwealth v. Baxter*, 537 Pa. 41, 46, 640 A.2d 1271, 1273 (1994)), retail theft (*Commonwealth v. Howard*, 823 A.2d 911, 913 n. 2 (Pa.Super.2003)), receiving stolen property (*Commonwealth v. McEnany*, 732 A.2d 1263, 1270 n. 1 (Pa.Super.1999); *Baxter, supra*), theft by extortion (*Henson, supra*), and robbery (*Commonwealth v. May*, 587 Pa. 184, 202, 898 A.2d 559, 569 (2006)),[4] are crimes involving dishonesty, and given the similarities between theft by extortion and collection of extension of credit by extortionate means, we conclude collection of extensions of credit by extortionate means satisfies the *crimen falsi* requisite.

4. *See generally* McCormick on Evidence § 42 (6th ed.2006); Bernstein, 2008 Pa. Rules of Evidence, Comments 4–6 to Pa.R.E. 609.

¶ 32 Cascardo next contends tampering with a witness under 18 U.S.C. § 1512 is not a *crimen falsi*. Cascardo in essence argues the trial court should have engaged in an analysis of the underlying facts relating to the commission of the federal offense bypassing the elemental analysis of the offense. In support, Cascardo relies on *Commonwealth v. (Robert James) Harris*, 442 Pa.Super. 116, 658 A.2d 811 (1995), in which this Court held hindering apprehension in violation of 18 Pa.C.S.A. § 5105 did not fall within ambit of *crimen falsi* and, therefore, could not be used for impeachment purposes.

¶ 33 Cascardo's reliance on *Harris* is misplaced. Cascardo fails to recognize in *Harris* we engaged in the analysis of the facts underlying the previous conviction because, based solely on the statutory definition of the offense, we concluded a conviction for hindering apprehension did not satisfy the *crimen falsi* requirement. However, even if the definition itself does not include a *crimen falsi* element, an offense might still be considered for purposes of impeachment under Pa.R.E. 609 if the facts of its commission may render it such in a particular case. *See Commonwealth v. Coleman*, 445 Pa.Super. 199, 664 A.2d 1381, 1383–84 (1995); *see also Harris, supra.*

¶ 34 Here, there is no need to engage in an analysis of the facts underlying Cascardo's federal conviction for tampering with witnesses because the offense, by definition, involves dishonesty directly affecting the administration of justice. *See Jones, supra.* As such, tampering with a witness under 18 U.S.C. § 1512 is a *crimen falsi*.

¶ 35 As noted above, evidence of a conviction,

is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction substantially outweighs its prejudicial effect.

Pa.R.E. 609(b).

¶ 36 In making this determination, the following factors should be considered:

1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; 2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; 3) the age and circumstances of the defendant; 4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and 5) the existence of alternative means of attacking the defendant's credibility.

*Commonwealth v. (Montez) Harris*, 884 A.2d 920, 925 (Pa.Super.2005) (citing *Commonwealth v. Randall*, 515 Pa. 410, 413, 528 A.2d 1326, 1328 (1987)).

¶ 37 Here, in 1991 Cascardo was convicted of collection of extensions of credit by extortionate means and tampering with a witness. Trial Court Opinion, 7/8/08, at 15. Cascardo was released from federal prison in 1993. *Id.* His trial commenced in 2007, beyond the ten year rule. As such, the admissibility of his federal convictions is subject to the above test.

¶ 38 Under the first factor, the federal convictions for *crimen falsi* are an appropriate basis for impeachment. Under the second factor, Cascardo's federal convictions do not suggest a propensity to commit murder, the charge that is being currently tried. Under the third factor, Cascardo, born on June 17, 1944, was forty-seven years old at the time of his federal convictions and, therefore, their relevance was not attenuated by age. Under the fourth factor, the Commonwealth's case depended in large measure on Gerber's testimony testifying that he and Cascardo killed Hoffner. Cascardo is the only other person who could have testified about the murder. Cascardo presented an alibi witness intended to show he could not have killed Hoffner because he was not at the scene of the murder. Attacking Cascardo's credibility was particularly important given his defense was totally contradictory to the Commonwealth's version of the facts. Under the fifth factor, a review of the record does not reveal an adequate alternative ground for impeaching Cascardo.

¶ 39 The trial court addressed the issue of balancing the probative value of the federal convictions with their prejudicial effect as follows:

> Although both sides presented significant evidence during this [week-long] trial, only two people—Gerber and [Cascardo]—could provide direct evidence as to whether [Cascardo] solicited and/or participated in the murder of Hoffner. As such, the credibility of both Gerber and [Cascardo] was critical to any analysis by the jury. If the jury believed Gerber, they could convict [Cascardo]. If the jury believed [Cascardo], an acquittal would have to follow.
>
> Because of the criticality of both Gerber's and [Cascardo]'s testimony, we concluded that the jury should hear as much as possible about each man's believability. One piece of information impacting upon the believability of [Cascardo] was his prior convictions involving dishonesty. We concluded at trial and still believe that the information regarding [Cascardo]'s prior record was probative of an extremely important issue—whether [Cascardo] should be believed by the jury. As such, evidence of [Cascardo]'s prior convictions had probative value within the context of the trial as it evolved.

Trial Court Opinion, 7/8/08, at 21–22 (footnote omitted).

¶ 40 In light of the applicable standard of review, after balancing the factors of the above test, we conclude the trial court properly denied Cascardo's motion *in limine* seeking to bar evidence of his federal convictions if he decided to testify at trial.

### C. *Hearsay evidence*

¶ 41 Cascardo argues the trial court erred in admitting statements by Hoffner to Tok–Cha Hoffner, Karen Hoffner, Anthony Hoffner, Larry Hoffner, Benjamin Hollingsworth, Jeffrey Rizzo and Floyd Hoffner. Appellant's Brief at 32. The statements introduced covered essentially two subjects: (i) while in bankruptcy, Hoffner had removed a large sum of money from the motel owned by his family and invested it with an individual Hoffner identified as "Big Shot," "Vince" or "the guy" and, (ii) Hoffner intended to confront said individual in September 2000 to get his money back. *See* Trial Court Opinion, 9/14/07, at 16–17; Appellant's Brief at 32.

¶ 42 In admitting said testimony, the trial court found the statements were admissible because they were an exception to the hearsay rule. Specifically, the statements falling within the first subject were admitted under the "declarations against interest" exception, and the statements

falling within the second subject were admitted under the "state of mind" exception. Trial Court Opinion, 9/14/07, at 18.

■ ¶ 43 Regarding the "declarations against interest" exception, Cascardo argues Hoffner's statements admitted under this exception "were unreliable for the simple reason that there was no showing that [Hoffner] knew that these statements were against his interest. There is nothing indicating that he knew that he could get into any legal trouble for defrauding the trustee in bankruptcy." Appellant's Brief at 34. Cascardo also maintains "even if there is some suspicion that [Hoffner] knew or believed that he could not deplete the assets of the bankruptcy estate, there certainly was an inadequate foundation." *Id.*

¶ 44 The rules of evidence, in relevant part, provide as follows:

> Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Pa.R.E. 804(b)(3).

■ ¶ 45 It is not relevant that declarant knows which section of the Crimes Code or the Bankruptcy Code he has violated. What matters is that the facts with-in the statements tended to subject the declarant to criminal liability and that a reasonable person in the declarant's position would not have made those statements unless believing them to be true. *See Commonwealth v. Anderson,* 501 Pa. 275, 289, 461 A.2d 208, 215 (1983).

¶ 46 A review of the testimony reveals Hoffner's parents (Larry and TokCha Hoffner) and Hui Chang Choe and Sun Sik Choe (Hoffner's aunt and uncle), in the early nineties, formed a partnership and acquired and managed a motel in Hershey, Pennsylvania. N.T. Trial, 9/18–9/25/07, at 183–84, 202–04, 273–74, 289–90. In 1993, the motel filed for bankruptcy.[5] *Id.* After other members left the business, Hoffner managed the motel from 1993 through 1997, *id.,* until the motel "went back" to the bank. *Id.* at 187, 204. Between June and August 1997, Hoffner withdrew approximately $50,000.00 from the motel account and deposited it into his own account. *Id.* at 240–48. On August 27, 1997, Hoffner withdrew $45,000.00 from his account. *Id.*

¶ 47 Hoffner told several witnesses about his "taking money" from the motel. *Id.* at 196, 198, 215, 222–23, 231, 276, 292. Whether he was taking money from the business without the partners' knowledge and/or to deplete the bankruptcy estate, Hoffner was aware it was not right to do so. *Id.* at 216, 222–23, 231, 233. It appears Hoffner was not much concerned about whether some business partners were aware of his taking money from the business, as its disclosure to at least one (Tok–Cha Hoffner) would indicate. It appears instead, between 1997 and 1999, Hoffner's main concern was "to find out if anybody was, you know—to make sure at

---

**5.** It appears the bankruptcy case was closed in 1996 but in 1997 the business "was still presumably operating under the confirmed order." Attorney Devlin's letter, 9/5/1997 (Exhibit n. 47).

that time the banks were not coming after him, that the police were not coming after him [Hoffner]. That is how, you know, that's how [Hoffner]—how [Hoffner] put it to me [Anthony Hoffner]." *Id.* at 200–1.

¶ 48 Hoffner was getting "legal" advice on "how to get the money out of the motel without getting in trouble" from an individual he identified as "Vince," "Big Shot" or, at times, simply as "the guy." *Id.* at 185, 196, 275–76, 290–91, 301. "Vince" would assist Hoffner from "outside" and contacts between the two were to be "minimal" and through untraceable means. *Id.* at 191, 200.

¶ 49 "Vince", "Big Shot," or "the guy" is the father of the owner of the pizza shop where An Duong worked. *Id.* at 185, 275, 290–91.[6] Duong introduced Hoffner to the "guy." *Id.* at 290. Two witnesses were able to identify in court Cascardo as "Vince" or "the guy" from having met him at the time the motel was closing. *Id.* at 189, 291. Hoffner considered "Big Shot" or "the guy" as a paternal figure, as someone to look up to. *Id.* at 286, 290.

¶ 50 Hoffner gave "Big Shot" the money he took from the motel. *Id.* at 276–80. Hoffner would get a "special" interest rate in return for investing that sum with "Big Shot." *Id.*

¶ 51 After reviewing the testimony, we conclude the trial court did not err in admitting Hoffner's statements relating to taking money from the family business while the bankruptcy proceedings were still pending as declarations against his penal interest.

¶ 52 Cascardo also maintains Hoffner's statements are not reliable because the Commonwealth failed to corroborate them. Appellant's Brief at 35. We disagree.

¶ 53 Reliability is determined by referring to the circumstances in which the declarant gave the statement, not by reference to other corroborating evidence presented at trial. *Commonwealth v. Robins,* 571 Pa. 248, 812 A.2d 514 (2002). Among the factors a court might consider in determining the reliability of inculpatory or exculpatory statements are:

> the circumstances under which the statements were uttered, including the custodial/non-custodial aspect of the setting and the identity of the listener; the contents of the statement, including whether the statements minimize the responsibility of the declarant or spread or shift the blame; other possible motivations of the declarant, including improper motive such as to lie, curry favor, or distort the truth; the nature and degree of the "against interest" aspect of the statements, including the extent to which the declarant apprehends that the making of the statement is likely to actually subject him to criminal liability; the circumstances or events that prompted the statements, including whether they were made with the encouragement or at the request of a listener; the timing of the statement in relation to events described; the declarant's relationship to the defendant; and any other factors bearing upon the reliability of the statement at issue.

*Id.* at 267, 812 A.2d at 525–26.

¶ 54 "While there is no required list of factors for conducting this evaluation, we note the commonly referenced ones listed *supra,* and thus begin with a consideration of the basic components, of when and where the statements were made, to whom

---

6. According to some witnesses, An Duong and Hoffner, were "buddies", "good friends," "pretty good friends," or "friends." *Id.* at 186, 293, 216, 205, 275; *but see id.* at 979: Duong described Hoffner as an "acquaintance."

they were made and what was said." *Id.* at 268, 812 A.2d at 526.

¶ 55 Hoffner told his brother, Anthony Hoffner, his mother, Tok–Cha Hoffner, his sister, Karen Hoffner, and his close friends, Benjamin Hollingsworth and Jeffrey Rizzo about some considerable amount of money he took from the family business. Hoffner essentially told them how he was able to hide it from the bankruptcy court and how and with whom he invested said money. Hoffner volunteered the information even though he was aware that "taking money" from the motel exposed him to potential criminal liability. We conclude, therefore, Hoffner's statements were reliable.

¶ 56 Regarding the "state of mind" exception, the Commonwealth intended to offer the testimony of witnesses to show Hoffner intended to confront Cascardo about the money he invested with him. *See* Pa.R.E. 803(3).[7]

¶ 57 The trial court, in admitting said statements, relied on *Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418 (1997), for the following proposition:

> On several occasions, we have held that a deceased victim's out-of-court statements evincing an intent to meet the defendant shortly before the killing were admissible pursuant to the state of mind exception because such an intent provided circumstantial evidence that the victim did meet with the defendant. [*Commonwealth v. Lowenberg*, 481 Pa. 244, 392 A.2d 1274 (1978)] (victim told third person that she wanted to see the defendant concerning a serious financial mat-

ter); [*Commonwealth v. Riggins*, 478 Pa. 222, 386 A.2d 520 (1978)] (victim told third party that she expected defendant to visit her home); [*Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301 (1926)] (victim told third party that she was going to meet defendant and would disclose her affair with another man); *see also Commonwealth v. Sneeringer*, [447 Pa.Super 241, 668 A.2d 1167 (1995)] (victim told third parties that she intended to end her relationship with the defendant); *Commonwealth v. Henderson*, [472 A.2d 211 (Pa.Super.1984)] (victim told third parties that he intended to meet with defendant to sell his automobile). In each case, the victim's intent to meet the defendant was relevant to the case because it permitted the jury to conclude that the defendant had the opportunity to commit the crime in question. Additionally, the victim's intent to confront the defendant about a financial matter in *Lowenberg* and the victim's intent to disclose her affair in *Marshall* were relevant to supply the jury with a potential motive for the killing in those cases.

*Collins*, 550 Pa. at 60, 703 A.2d at 425.

¶ 58 The trial court reasoned as follows:

> In this case, [Hoffner]'s statement that he intended to confront "the guy" in order to obtain his $50,000.00 investment back plus interest is admissible under the state of mind exception. We see no distinction between the statement of intent referenced in the above cases and Hoffner's statement of intent that the

---

7. Rule 803(3) reads as follows:

Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of

memory or belief offered to prove the fact remembered or believed is included in this exception only if it relates to the execution, revocation, identification, or terms of declarant's will.

Pa. R.E. 803(3).

Commonwealth wishes to introduce in this case.

Trial Court Opinion, 9/14/07, at 20.

¶ 59 Cascardo argues the trial court's reliance on *Collins* is misplaced because in *Collins* and the other cases cited therein the victim identified the defendant as opposed to this case where "the jury was left to pile inference upon inference to conclude" the witnesses were referring to Cascardo. Appellant's Brief at 36.

¶ 60 While Hoffner did not identify Cascardo by his exact first and last name, the Commonwealth offered overwhelming evidence showing Hoffner referred to Cascardo as "Vince," "Big Shot" or "the guy" and that "Vince," "Big Shot," "the guy" and Cascardo are all the same person. *See supra.*

¶ 61 In light of the foregoing, we conclude the trial court did not err in admitting the statements under the "state of mind" exception.

### D. *Brady violation*

 ¶ 62 Cascardo finally argues the Commonwealth withheld and/or failed to provide exculpatory evidence. Appellant's Brief at 37–42.

> To establish a violation under *Brady*, an appellant must demonstrate: 1) suppression by the prosecution 2) of evidence, whether exculpatory or impeaching, favorable to the [appellant], 3) to the prejudice of the [appellant]. The evidence purportedly suppressed must have been material to guilt. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*Commonwealth v. Clark,* 599 Pa. 204, 219, 961 A.2d 80, 89 (2008) (citations and quotation marks omitted) (alteration in original).

¶ 63 Cascardo raised this claim for the first time in his first post-sentence motion. The trial court held a hearing on the motion. After counsel for both parties testified, the trial court denied it. Cascardo now argues trial counsel's testimony, contrary to the trial court's findings, "is not the least bit equivocal." Appellant's Brief at 38. To this end, Cascardo quotes two full paragraphs of trial counsel's testimony. Cascardo concludes "[r]ather than taking a single sentence out of context, this passage clarifies that [trial counsel] expressed confidence that he was as certain as he could be under the circumstances that he did not receive [Trooper James A. Biever]'s grand jury transcript." *Id.* Cascardo also noted the Commonwealth was "no more certain than [trial counsel]." *Id.*

¶ 64 Whether we consider one sentence or the whole passage, it is clear trial counsel could not say with certainty the Commonwealth did not hand over the transcripts. Even if the Commonwealth were "no more certain" than trial counsel, Cascardo fails to acknowledge "appellant must prove, by reference to the record, that evidence was withheld ... by the prosecution." *Commonwealth v. Copenhefer,* 553 Pa. 285, 319, 719 A.2d 242, 259 (1998).

¶ 65 Cascardo also points out trial counsel did not have a citation to Trooper Biever's grand jury transcript in his trial notes whereas he had notes for other witnesses. Since there were no notes in connection with Trooper Biever's testimony, in Cascardo's view, that fact "corroborated [trial counsel's] belief that he did not receive Trooper Biever's notes." Appellant's Brief at 39. Even in his appellate brief, Cascardo's argument is based on what trial counsel "believes" has happened. However, Cascardo does not prove, by reference to the record, trial counsel's belief.

¶ 66 The trial court, after holding a hearing on this matter, found the Commonwealth disclosed Trooper Biever's grand jury transcript in accordance with the agreement reached between the Commonwealth and the defense team. In reaching said conclusion, the trial court credited the testimony of the prosecutors, found trial counsel's testimony equivocal, and noted trial counsel admitted his defense team misplaced discovery evidence during the course of trial.

¶ 67 The trial court also found even if the Commonwealth withheld the transcript, the omission was not material because Trooper Biever's grand jury testimony "was consistent with and added little to what had already been turned over to [Cascardo] in the Commonwealth's discovery package." Trial Court Opinion, 7/8/08, at 14. The trial court also noted questions to Trooper Biever regarding Cascardo's personal financial records could have been articulated even without the alleged missing transcript. *See id.* n. 6. The trial court concluded the result of the trial would not have been different even if the transcript had been handed over to the defense.

¶ 68 We need not reach the question of materiality because we conclude Cascardo failed to prove the Commonwealth has withheld the transcripts relating to Trooper Biever's grand jury testimony. As such, Cascardo's *Brady* claim is without merit.

¶ 69 Judgment of sentence affirmed.